SUCCESSION OF RICHARD S. RISLEY—HENRY S. RISLEY, Appellant.

One who has effected insurance on his life may assign the policy, or a part of it, to a *bona fide* creditor; but such an assignment will be without effect as to third persons, creditors of the insured, where there was no proof of notice to the assurers before the death of the assured, nor of the acceptance of the assignment by the transferee before that date, and the policy remained in the possession of the assignor. C. C. 1804, 2612, 2613.

The assignor of a debt is not divested of title, as to third persons, before notice to the debtor; till then the assignee has but an inchoate right. C. C. 2613.

APPEAL from the Court of Probates of New Orleans, *Bermudez*, J.

MORPHY, J. On the 10th of May, 1841, Richard S. Risley had his life insured for $5000, at the office of the Ocean Insurance Company, for the space of one year. He died within the time covered by the policy, on the back of which he had endorsed, at different dates, four several assignments for $1,000 each, one in favor of Mills Judson, one in favor of his brother Henry S. Risley, and two in favor of Benjamin J. Leedom. Of these assignments, that in favor of Judson, and one of the two in favor of Leedom were approved of by the Company, while the others had not been notified to then at the time of the death of the insured. The underwriters paid the full amount of the policy. John W. Andrews, the executor of the deceased, considering as complete the two transfers approved by the office, agreed that $1,000 should be received by Judson; and having received himself the remaining $4,000 with the consent of the other assignees, to avoid all delay and difficulty on the part of the Company, he paid a thousand dollars to B. J. Leedom. The balance of $3,000, he carried to the credit of the succession of Richard S. Risley in the account which he subsequently rendered in the Court of Probates. In this account which shows the estate to be insolvent, he placed Leedom and H. S. Risley as ordinary creditors of the deceased, for $1,000 each. Henry S. Risley opposed the homologation of the account, averring that he is the only person entitled to the $1,000 transferred to him on the policy, and that the creditors of the estate have no right or title to any portion of said sum, for which he prayed to be declared a privileged cred-

itor.   B. J. Leedom claimed a similar privilege for the two thousand dollars transferred to him by the deceased, alleging that the sum apparently paid to him had been appropriated to pay another debt of Risley's.   Oppositions were made by other creditors, and by Leedom, to various items of the account, which it is unnecessary to notice as they have been passed upon below, and no amendment of the judgment thereon has been prayed for in this court.   In relation to the claims of Leedom and Henry S. Risley, the probate judge was of opinion that all the transfers made by the deceased should be disregarded as being *contra bonos mores*, and as giving an undue preference to some of the creditors over the others; he, therefore, refused the privilege prayed for, and ordered that the executor should account for the full sum of $5,000, being the amount of the policy, in lieu of the $3,000 which he carried to the credit of the succession. From this judgment Henry S. Risley appealed.   Benjamin J. Leedom prayed for an amendment of the judgment, so as to place him on the tableau as a privileged creditor for $2,000, instead of the $1,000 allowed him as an ordinary creditor ; and the executor prayed that it might be so amended as to debit him with no greater amount than that which he has credited to the succession.

We cannot agree with our learned brother of the Court of Probates, that the transfer of a life policy by the person insured, to one or more of his creditors as collateral security, has any thing in it *contra bonos mores*.   In France, and other countries of Europe, it is true, insurances on life were for a long time held illegal, and were even expressly prohibited.   According to a maxim of the civil law, the life of a free man was deemed above all valuation—*liberum corpus æstimationem non recipit;* and the French commentators, with the single exception, perhaps, of Pardessus, inveigh against such policies as being gambling contracts of the worst kind ; but even in those countries, the practice of life insurance, which is now so prevalent in England and in the United States, begins to be viewed in a different light, and life insurance companies have been established in several places.   Their usual purpose, says chancellor Kent, is to provide a fund for creditors, or for family connections, in case of death.

" A *bonâ fide* creditor has an insurable interest in his debtor's life to the extent of his debt, for there is a probability, more or less remote, that the debtor would pay the debt if he lived. A person may insure his own life for the benefit of his creditors, or he may insure the life of another in which he may be interested, and assign the policy to those who have an interest in the life," 3 Kent, pp. 366–367. When the assignee has a legal and direct pecuniary interest in the life of the insured, and the evidence satisfies us that such an interest existed in this case, we can see nothing immoral in the transfer of a life policy to him as collateral security. 2 Marshall, on Insurance, p. 766. 12 Massachusetts Reports, p. 115. As to the undue preference which these transfers may give to the transferees over the other creditors, it is sufficient to say, that no revocation of them, on that ground, has ever been demanded by the executor or any of the creditors, and that more than one year has elapsed from the date of these transfers, and from the appointment of the executor. Civil Code, arts. 1982, 1989.

The only question then which this case presents is, whether the assignments made to the opponents are valid, although no notice was given to the insurance office during the life time of the assignor. It is urged that as this policy does not contain the ordinary clause that no assignment shall take place without the consent of the underwriters, but, on the contrary, promises to pay $5,000 to the insured, his executors, administrators and assigns, no such consent was necessary to render the transfers binding on them. Admitting this to be true as between the assignees and the office, the question yet remains, have these transfers without notice to the company, before the death of the insured, vested any rights in the opponents, to the prejudice of his other creditors? We see nothing that should take this case out of the general rule laid down in article 2613 of our Code, that the transferree of a debt, or other incorporeal right, is only possessed, as regards third persons, after notice has been given to the debtor of the transfer having taken place. The preceding article provides that in the transfer of debts, rights, or claims on a third person, the delivery takes place between the transferrer and the transferree, by the giving up of the title. In this case,

the policy remained in the possession of the transferrer. No no-tice whatever of the transfers was given to the Insurance Com-pany, and it is not even shown that such transfers were accep-ted by the transferrees before the death of Richard S. Risley. Civil Code, art. 1804. Under these articles of the Code, it has been repeatedly and uniformly held, that the assignment of a debt vests in the assignee. only an inchoate right, and that the assignor is not divested, as regards third persons, until notice be given to the debtor. *Cox* v. *White.* 2 La. 425. *Carlin* v. *Dumar-trait,* 5 Mart. N. S. 21. *Bainbridge* v. *Clay,* 4 Ib. N. S. 56. It has been held in England, says Phillips, on Insurance, that life policy are assignable so as to give a right of action in the name of the assured, and they are frequently assigned as security for loans. It has been held, however, that where a policy was assigned, without notice of the assignment to the insurers before the bank-ruptcy of the assured, the property in the policy passed to the assignees. 1 Phillips, p. 38, and the authorities there quoted.

It is urged by the appellant that, in receiving the money from the underwriters, Andrews acted not as executor, but as his mandatary to collect it, and wrongfully converted it to the use of the estate. If this were true, he might at best have a per-sonal action against Andrews; but the record shows that the lat-ter, as executor, had notified the company not to pay any of the transferrees; that this opposition was subsequently withdrawn with regard to the two transfers approved and recorded on the books of the office; that the appellant authorised Andrews to receive the money which the company was unwilling to pay to him; and that Andrews receipted for it to them as execu-tor. This course was clearly pursued to avoid all delay and difficulty, and with the understanding, no doubt, that the rights of the parties to this money should be afterwards settled in due course of law.

In relation to the $1,000 received by Leedom under his ap-proved transfer, it appears from the evidence that $825 of this sum were paid in his discharge to J. W. Zacharie, who held a draft drawn upon Leedom by the deceased, and which he had accepted; that this draft was drawn and negotiated by the de-ceased entirely for his accommodation, and at a time when he

was indebted to Leedom. For this amount, the latter is, we think, entitled to a credit on the tableau as an ordinary creditor.

It is, therefore, ordered and decreed, that the judgment of the Court of Probates, be so amended as to debit the executor with no larger amount than that which he has carried to the credit of the succession, and to place Benjamin J. Leedom on the tableau as an ordinary creditor of the deceased, for $1,825, instead of $1,000; and that it be affirmed in all other respects, with costs.

*Hornor*, for the appellant.

*Barker*, for Leedom.

*Winthrop*, for the executor.